**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| **Evan Gorski,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action** |
| | : | |
| **v.** | : | **No. 22-cv-_____** |
| | : | |
| **City of Philadelphia, Joseph Bologna,** | : | **Jury Trial Demanded** |
| **Brandon McPoyle, and Brian Dillard,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**COMPLAINT**

## I.    Introduction

1.      On June 1, 2020, during a peaceful protest against police brutality, Joseph Bologna, a high-ranking staff inspector with the Philadelphia Police Department, violently assaulted 21-year-old Evan Gorski by striking him on the head with an ASP, a metal baton designed to cause injury.  The strike caused a deep laceration on the back of Mr. Gorski's head, requiring repair with ten surgical staples.  Mr. Gorski had done nothing to provoke the assault.

2.      Bologna acted with extreme impunity.  The demonstration during which he assaulted Mr. Gorski was part of a massive, international outcry following the police killing of George Floyd in Minneapolis six days prior.  Hundreds of people were present at the scene on the Benjamin Franklin Parkway, one of Philadelphia's most recognizable locations for public gathering.  Many people present were making video recordings of the demonstration and posting them to social media.  Indeed, one person standing just feet away from Mr. Gorski captured video of the entire incident.  That person posted the video to Twitter.  Within hours, it had been widely circulated across the internet.

3.      Despite knowing that he had committed an unprovoked violent attack against a defenseless Mr. Gorski, and despite knowing that numerous people had seen the entire incident, Bologna, along with fellow Philadelphia police officers, Brandon McPoyle and Brian Dillard, fabricated criminal charges against Mr. Gorski falsely alleging that he had assaulted an officer and caused injury to that officer.  As a result of those false allegations, Mr. Gorski was arrested and detained in squalid surroundings at the House of Correction—a prison that had been closed for more than two years due to what multiple members of Philadelphia City Council described as its "inhumane" conditions.  Mr. Gorski was in custody for approximately 42 hours until prosecutors in the Philadelphia District Attorney's Office reviewed the reports concerning his arrest and declined to bring charges against him, leading to his release from custody.

4.      The conduct of Bologna, McPoyle, and Dillard and the harms Mr. Gorski suffered are tied directly to the actions and inactions of policymakers for the City of Philadelphia in several respects.  First, for years prior to Bologna's assault of Mr. Gorski, the City was aware from the filing of multiple lawsuits and citizen complaints that Bologna had a history of unlawful and abusive police tactics, including the use of inappropriate force, yet he continued to receive promotions through the Philadelphia Police Department ("PPD") ranks.  Second, for decades, the City has followed a widespread practice of aggressive and violent police response to peaceful political protest, the logical consequence of which was actions like the assault and arrest of Mr. Gorski.  Third, in reaction to multiple days of demonstrations leading up to the time of Mr. Gorski's assault, the City made a deliberate choice to abandon previously developed operational plans to ensure the safety of people engaged in political protest, and, consistent with its long-held practices, specifically encouraged its officers and supervisors—including Bologna—to pursue aggressive tactics and use unjustified physical force.  And, fourth, the City elected to place

dozens of people arrested during political demonstrations on or around June 1, 2020, in the House of Correction, while knowing that its conditions were not fit for human habitation.

5.      As a result of this conduct, Mr. Gorski suffered substantial harms and losses, including physical pain and suffering, emotional trauma, loss of liberty, and financial losses.  Mr. Gorski brings this action asserting claims under 42 U.S.C. § 1983 to hold the defendants' accountable for the egregious violation of his civil rights.

**II.     Jurisdiction**

6.      This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

**III.    Parties**

7.      Plaintiff Evan Gorski is a 23-year-old resident of Philadelphia, Pennsylvania.

8.      Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs, and controls the Philadelphia Police Department, which, at all times relevant to this Complaint, employed the below individual defendants.

9.      Defendant Joseph Bologna was, at all times relevant to this Complaint, a staff inspector in the Philadelphia Police Department.  He is sued in his individual capacity.

10.     Defendant Brandon McPoyle was, at all times relevant to this Complaint, a police officer in the Philadelphia Police Department.  He is sued in his individual capacity.

11.     Defendant Brian Dillard was, at all times relevant to this Complaint, a police officer in the Philadelphia Police Department.  He is sued in his individual capacity.

12.     At all times relevant to this Complaint, all defendants acted under color of state law and in concert and conspiracy.  All defendants are jointly and severally responsible for the harms caused to Mr. Gorski.

**IV.    Facts**

**A.    The Assault and Unlawful Arrest and Detention of Evan Gorski**

13.     On May 25, 2020, George Floyd, a 46-year-old Black man, was killed by police officers in Minneapolis.  The actions leading to Mr. Floyd's death were captured on a cellphone video recorded by a civilian witness.  The witness posted the video to social media, and, by the next morning, the video had gone viral, having been viewed many millions of times.

14.     In the days that followed, protests against police violence spread from Minneapolis, throughout the United States.  By week's end, protests were occurring daily all over the world, including in Philadelphia.  In these protests, demonstrators expressed frustration and anger over an unending line of racist police murders of Black people, including the recent deaths of Breonna Taylor and Ahmaud Arbery, culminating in the killing of Mr. Floyd.

15.     In June 2020, plaintiff Evan Gorski was 21 years old and a student at Temple University studying engineering.

16.     Mr. Gorski grew up in the Philadelphia area.  He was raised in the Quaker faith tradition, attended Quaker schools from kindergarten through high school graduation, and was deeply invested in the Quaker tenet of nonviolence.

17.     In the days following George Floyd's murder, Mr. Gorski was moved to participate in peaceful demonstrations against police violence.

18.     On June 1, 2020, Mr. Gorski went with some of his roommates and friends to a demonstration at 8th and Race Streets in Center City Philadelphia, the location of the Philadelphia Police Department's headquarters.

19.     Following a series of speeches at that location, the demonstrators began marching through Center City.  Mr. Gorski joined in the march and followed it to the intersection of 22nd and Vine Streets, near the entrance to the Vine Street Expressway.

20.     Mr. Gorski remained at or around that location and watched as hundreds of demonstrators marched onto the Vine Street Expressway and were then subjected to indiscriminate tear gassing.

21.     Mr. Gorski then joined several dozen demonstrators in kneeling on the ground at the intersection of 22nd and Vine Streets while chanting anti-police violence slogans.

22.     Throughout this political demonstration, Mr. Gorski was peaceful.

23.     As Mr. Gorski and the other demonstrators were engaged in this non-violent demonstration, a unit of Philadelphia police officers with bicycles approached the demonstrators.

24.     The unit was led by defendant Joseph Bologna.

25.     Shortly after 5:00 pm, the officers created a line with their bicycles and used them to physically force demonstrators away from the intersection.

26.     The officers did so violently.  They rammed their bicycles into the bodies of demonstrators and screamed at them to move.

27.     Throughout this process, Mr. Gorski remained peaceful.  On each occasion when officers directed him to move away, he did so.

28.     As the officers continued to move demonstrators away from the intersection, Mr. Gorski observed two officers, one of whom was defendant Bologna, pulling on the arms of

another demonstrator.  The demonstrator was also being pushed by another officer who was moving his bicycle against the demonstrator.

29.     To Mr. Gorski, the demonstrator appeared to be at significant risk of injury because he was being pushed and pulled in two different directions at the same time.

30.     Mr. Gorski placed one hand on the demonstrator's left arm in an effort to ensure that the demonstrator would not be injured.

31.     At no time did Mr. Gorski touch Bologna or the other officer.

32.     As soon as Mr. Gorski placed his hand on the demonstrator's arm, Bologna turned toward Mr. Gorski.  Bologna had in his right hand a Philadelphia Police Department-issued ASP—a telescoping, metallic baton.

33.     When swung with force, the ASP is designed to cause severe pain and injury through a whipping motion.

34.     Officers in the Philadelphia Police Department are trained that when they use an ASP they are prohibited from striking a person anywhere above the neck.  They are trained that any strike to the head with an ASP could cause severe injury or death.

35.     As of June 1, 2020, Bologna knew that he was not permitted to use his ASP to strike a person on the head and that violation of this rule could result in severe injury or death.

36.     When Bologna turned toward Mr. Gorski, he raised his right hand with the ASP over his head.

37.     Mr. Gorski, seeing that Bologna had raised a weapon over his head, immediately retreated away from Bologna.

38.     Bologna saw that Mr. Gorski was retreating away from him, yet he stepped toward Mr. Gorski with his right hand still raised over his head.

39.     Bologna violently swung the ASP at Mr. Gorski's head, striking Mr. Gorski approximately two inches below the crown of his head.

40.     Bologna did so despite knowing that Mr. Gorski had done nothing to provoke the use of force, despite knowing that Mr. Gorski was retreating from him, and despite knowing that a strike to Mr. Gorski's head could cause serious injury or death.

41.     Mr. Gorski immediately fell to the ground.

42.     Bologna forced Mr. Gorski to lay on the street face-down.  He and another officer put Mr. Gorski into handcuffs and placed him under arrest.

43.     Mr. Gorski had committed no crime, and there was no legal basis to place him under arrest.

44.     Two officers walked Mr. Gorski back to 22nd Street and forced him to sit on the ground while remaining handcuffed.

45.     During this time, Mr. Gorski could tell that the strike to his head had caused a serious wound.  He could feel blood matting his hair and noticed that his blood was staining the white uniform shirt of a nearby officer.

46.     Mr. Gorski was, while remaining handcuffed, placed into the back of a police van and taken to the emergency department at Jefferson University Hospital.

47.     Police escorted Mr. Gorski into the emergency department and then handcuffed him to a bed.

48.     Physicians in the emergency department assessed the wound on the back of Mr. Gorski's head and determined that sutures were required to repair it.

49.     Physicians applied subcutaneous sutures to the wound and then determined that surgical staples were required.  They placed ten staples in the wound.

7

50.     Because Mr. Gorski had been struck by a metal object, medical professionals determined that Mr. Gorski required a tetanus shot.  Mr. Gorski consented to receiving the shot, and it was provided.

51.     Mr. Gorski remained handcuffed to the bed throughout the treatment he received.

52.     While Mr. Gorski was receiving treatment, Bologna, joined by Officers McPoyle and Dillard, prepared reports in support of the arrest of Mr. Gorski.

53.     McPoyle and Dillard had been present and observed the circumstances of Bologna's use of force against Mr. Gorski and were aware that there was no justification for the use of any force against Mr. Gorski.  Despite this knowledge, defendants McPoyle and Dillard failed to intervene to prevent Bologna's use of force.

54.     In the reports they created, Bologna, McPoyle, and Dillard alleged that Mr. Gorski had assaulted an officer and, among other things, that Mr. Gorski had caused McPoyle to suffer a broken hand.

55.     The reports were utterly false and fabricated.  Mr. Gorski had not assaulted any officer and had nothing to do with any injuries McPoyle suffered.

56.     Bologna, McPoyle, and Dillard conspired to bring false charges against Mr. Gorski in an effort to cover up and conceal Bologna's unjustified and excessive use of force against Mr. Gorski and the failure of McPoyle and Dillard to intervene in Bologna's use of force.

57.     Bologna, McPoyle, and Dillard knew that if Mr. Gorski was found guilty of assaulting an officer, then they would be able to claim that the use of force against Mr. Gorski was justified.

58.     Accordingly, Bologna, McPoyle, and Dillard prepared the false reports alleging criminal conduct by Mr. Gorski with the intention of protecting themselves from accountability for the harms caused to Mr. Gorski.

59.     Once medical professionals finished treating Mr. Gorski's injuries, Mr. Gorski was placed into the back of a police van and transported to two different Philadelphia Police Department district headquarters: the Ninth District on the west side of Center City and the Sixth District on the east side of Center City.

60.     At both locations, Mr. Gorski overheard someone inform the officers who were transporting him that they had brought him to the wrong location.

61.     Late in the evening, officers transported Mr. Gorski to the House of Correction facility on the Philadelphia Department of Prisons campus in Northeast Philadelphia.

62.     The City of Philadelphia had directed the closure of the House of Correction in 2018 but reopened it on the evening of June 1, 2020, to house detainees taken into custody during demonstrations against police brutality.

63.     Mr. Gorski remained in custody at the House of Correction for close to twenty-four hours.  While there, he was subjected to abhorrent conditions.

64.     On assignment to a cell, Mr. Gorski was directed to take a thin mattress from a pile placed on the floor.  He was given a spray container with a clear liquid in it and directed to use the liquid to clean the mattress.

65.     Mr. Gorski was not given a pillow, a blanket, a sheet, or any other personal hygiene products, including soap, toothpaste, or toilet paper.  Nor was Mr. Gorski permitted to make a telephone call to speak with his family.

66.     The facility was in a state of extreme disrepair.  There were pipes leaking liquid onto the walls and floor, paint flaking off the walls, and windows with broken glass.

67.     Correctional officers employed by the Philadelphia Department of Prisons were assigned to supervise the detainees.  Mr. Gorski asked one of the officers how long he would be held in the facility, and the officer replied that he did not know and that the Philadelphia Police Department had decided to drop the detainees at the House of Correction without warning to any of the prison staff.

68.     Correctional officers could be heard discussing with one another that the facility and the lack of hygiene items posed a serious danger to detainees and that the detainees should be removed from the facility immediately.

69.     Mr. Gorski remained detained at the House of Correction through the night and into the afternoon of June 2, 2020.

70.     That afternoon, an officer ordered Mr. Gorski and the people with whom he was sharing a cell to turn over their shoelaces and belts as a purported measure to protect them from harming themselves.

71.     The officer issued this order despite the fact that Mr. Gorski had been permitted to keep his belt and shoelaces for the first day-and-a-half of his detention and was able to pick up a handful of glass shards from the window in the cell.

72.     The officer made no effort to remove the glass from the cell.

73.     By the late afternoon of June 2, 2020, Mr. Gorski had still not been given an opportunity to make a telephone call to any family member. Finally, a correctional officer supervising the area where Mr. Gorski was housed allowed Mr. Gorski to use the officer's personal cell phone to contact his mother.

74.     At approximately 9:00 pm on June 2, 2020, Mr. Gorski was taken out of his cell at the House of Correction and transported to the Police Detention Unit in the basement of the Philadelphia Police Department headquarters at 8th and Race Streets.

75.     On arrival in the Police Detention Unit, Mr. Gorski was given a bracelet identifying the charge for which he had been arrested: aggravated assault on a police officer.

76.     Mr. Gorski remained detained in the Police Detention Unit through the nighttime hours of June 2 and into the morning of June 3.

77.     In that time period, prosecutors in the Philadelphia District Attorney's Office reviewed the false reports prepared by defendants Bologna, McPoyle, and Dillard.  Based on their review of those reports and additional investigation, the District Attorney's Office declined to bring charges against Mr. Gorski.

78.     That decision was communicated to the Police Detention Unit and, shortly after 12:00 pm on June 3, Mr. Gorski was released from custody.  He had been detained for approximately 42 hours since his arrest on June 1.

**B.      The City of Philadelphia's Responsibility for Mr. Gorski's Harms and Losses**

79.     The unlawful conduct of defendants Bologna, McPoyle, and Dillard and the harms suffered by Mr. Gorski are directly attributable to the affirmative decisions by policymakers of the City of Philadelphia and the failure to act on the part of those policymakers with deliberate indifference to the risk that such failures would lead to the violation of civilians' constitutional rights.

**1.      The Failure to Train, Supervise, and Discipline Defendant Bologna**

80.     For years prior to the June 1, 2020, assault of Mr. Gorski, the City of Philadelphia was aware of an alarming pattern of misconduct by defendant Bologna.

11

81.     Despite this knowledge, instead of properly disciplining him, the City continually promoted Bologna, explicitly approving for his misconduct.

82.     Bologna's history of misconduct was well documented in both newspaper articles and civil complaints.

83.     On August 22, 2009, The Philadelphia Inquirer published an article regarding illegal raids on convenience stores performed by a unit of four PPD narcotics officers working under Bologna's supervision.[1]   The article described surveillance video footage showing Bologna directing officers to cut the cords supplying power to the store's surveillance camera system.  Then PPD Commissioner Charles Ramsey stated that he could not think of any official reason for police officers to cut camera wires.  After this reporting, people connected with at least five other convenience stores reported that Bologna's unit had cut cords to their surveillance cameras and/or stole money and merchandise.

84.     Additionally, on April 24, 2014, The Philadelphia Inquirer published an article regarding Bologna and the same four officers under his command.[2] According to then Commissioner Ramsey, PPD's Internal Affairs Division, which is responsible for investigating allegations of officer misconduct, sustained several allegations of wrongdoing.  In particular, Bologna, was found to have failed to properly supervise Officer Richard Cujdik as he was present when Cujdik improperly searched a car without a warrant.  As stated in the article, the

---

[1] Wendy Ruderman & Barbara Laker, *Video sharpens focus on raid*, The Philadelphia Inquirer (August 22, 2009), *available at*, https://www.inquirer.com/philly/news/special_packages/20090330_Video_sharpens_focus_on_raid.html

[2] Mike Newall & Aubrey Whelan, *No criminal charges for four Philly officers in 'Tainted Justice' Cases*, The Philadelphia Inquirer (April 24, 2014), *available at*, https://www.inquirer.com/philly/news/20140425_No_criminal_charges_for_narcotics_officers_in__Tainted_Justice__series.html

City of Philadelphia settled 33 lawsuits for a total of $1.7 million related to misconduct by Bologna and the officers he supervised.

85.     Some of the lawsuits referenced in the Inquirer's reporting and involving misconduct by Bologna acting in a supervisory capacity include the following facts:

a.     Plaintiffs Joseph and Tamara Marcolongo, in civil action No. 09-cv-3554, alleged that Bologna and his fellow officers entered their home, punched Mr. Marcolongo in the face, took money from the plaintiffs (including $80 from a child's piggybank), and falsely claimed that they found illegal narcotics.

b.     Plaintiffs Juan Collado-Gomez and Josephina Fortuna, in civil action No. 09-cv-03911, alleged that Bologna and officers under his command raided his convenience store; restrained him and an employee; cut wires for all surveillance cameras in the store; took money from the cash register, from Mr. Collado-Gomez's person, and his apartment directly above the store; stole cigarettes and other items from the store; and prepared a false affidavit of probable cause to justify their illegal actions.

c.     Plaintiff Antonio Lanzara, in civil action No. 09-cv-4071, alleged that officers working under Bologna's supervision prepared a false affidavit of probable cause to justify the search of his property and, further, that a confidential informant who purportedly gave information concerning alleged criminal activity by Mr. Lanzara has been paid large sums of money by an officer working under Bologna.

d.     Plaintiff Jose Duran, in civil action No. 09-cv-4120, alleged that

Bologna, in concert and conspiracy with officers under his command, provided a false affidavit of probable cause to justify a search of the store he owned and operated; destroyed and seized video surveillance equipment from his store without cause or justification; and caused Mr. Duran to be unlawfully arrested, detained, and prosecuted by providing knowingly false information.

e.   Plaintiff Emilio Vargas, in civil action No. 09-cv-5267, alleged that Bologna, acting in concert and conspiracy with officers he supervised, disregarded proper police practices regarding the use of confidential informants in conducting an illegal search of the store Mr. Vargas managed; destroyed and seized video surveillance equipment from the store without cause or justification; and stole money and merchandise during the illegal search of the store.

f.   Plaintiff Robert Daly, Jr., in civil action No. 09-cv-6216, alleged that Bologna, with officers he was supervising, illegally seized his money and other property; used unreasonable force against him; and provided information from a confidential informant they knew to be false in order to justify the search and prosecution of Mr. Daly for narcotics offenses.

86.   Lawsuits against Bologna for civil rights violations date to a time period well before his assuming a supervisory role in the PPD narcotics unit, including the following:

a.   Plaintiff Neftali Ramos Reyes, in civil action No. 05-2775, alleged that Bologna, along with his fellow officers, caused Mr. Reyes severe injuries

14

by repeatedly kicking and beating him without legal cause during an arrest, resulting in a broken nose.

b.   Plaintiffs Brandon Banks and Brittany Albitz, in civil action No. 04-1052, alleged that Bologna, along with other defendant officers, punched Mr. Banks in the face, conducted an unjustified search of their home, brought a drug suspect into their home, and commenced a violent of interrogation of the suspect.

87.   Despite this history, the City of Philadelphia failed for years to discipline Bologna.  On the contrary, Bologna received continued promotions through the hierarchy of the PPD to the point that he held a position as a high-ranking staff inspector as of June 1, 2020.

88.   Based on his history of interactions with civilians in the performance of his police duties, policymakers for the City of Philadelphia were aware of an obvious risk that Bologna would act in an unconstitutional manner.

89.   The City enhanced that risk when, in the wake of George Floyd's murder and the massive demonstrations that followed, they authorized Bologna to command a unit of officers deployed on bicycles and assigned to monitor protest activity.

90.   These risks were realized throughout June 1, 2020, and June 2, 2020, when the largest demonstrations occurred.

91.   According to a social media posting later in the week, between 4:35 pm and 4:55 pm on June 1, Bologna assaulted a woman who had been placed into handcuffs in the area of Broad and Cherry Streets.

92.   This incident occurred approximately one hour before Bologna assaulted Mr. Gorski and unlawfully took him into custody.

93.     Video of Bologna's assault of Mr. Gorski was posted on Twitter by a user with the account name @Peopledelphia at 6:49 pm on June 1, just over an hour after the assault occurred.[3]

94.     In light of the video's posting, policymakers for the City of Philadelphia knew that Bologna had acted unlawfully and caused serious harm while commanding a unit of officers at a political demonstration.

95.     Notwithstanding that knowledge, they allowed Bologna to continue in these duties the next day, thereby ratifying and endorsing his previous unlawful conduct.

96.     On June 2, 2020, Bologna and his unit were operating in the area of 10th and Market Streets in Center City Philadelphia when Bologna encountered Caley Cohan.  Ms. Cohan brushed her foot against the front tire of Bologna's bicycle.  In response, Bologna grabbed Ms. Cohan and threw her to the ground causing her injury.

97.     Bologna and fellow officers took Ms. Cohan into custody and, just as they had done the day before with Mr. Gorski, prepared reports falsely alleging that Cohan had assaulted them.  Ms. Cohan was detained for nearly 19 hours and charged with aggravated assault.

98.     Video of the encounter was posted to social media.  It showed that Ms. Cohan had committed no crime, but that, instead, Bologna had assaulted her.  As a result of that video, the charges brought against Ms. Cohan were dismissed.[4]

99.     Based on social media postings concerning the assaults and false arrests of both Mr. Gorski and Ms. Cohan, the City was aware of a disturbing pattern of Bologna's violent and

---

[3] *See* https://twitter.com/Peopledelphia/status/1267588991655784448.

[4] Ms. Cohan has brought litigation against, among others, the City of Philadelphia and Bologna. The litigation is now pending in this Court.  *Cohan v. Bologna*, No. 21-cv-4328-KSM.

unlawful conduct.  Despite that knowledge, the City took no action to immediately investigate or discipline Bologna.

100.    Bologna remained actively engaged in the policing of protest activities until three days later, on June 5, 2020, when the Philadelphia District Attorney's Office announced that it would bring criminal charges against Bologna for his assault of Mr. Gorski.

101.    Those charges remain pending against Bologna.

102.    Upon information and belief, the City of Philadelphia took no disciplinary action against Bologna, but, instead, allowed him to retire from his employment with the Philadelphia Police Department.

        **2.      The City's History of Abusive Response to Peaceful Political Protest**

103.    The actions by defendants Bologna, McPoyle, and Dillard on June 1, 2020, were the logical consequence of a long history of abusive conduct by Philadelphia police in response to peaceful protest and political expression protected by the First Amendment.

104.    Over the past several decades, Philadelphia police have systematically violated basic constitutional rules protecting the rights of private citizens to make their voices heard.

105.    By way of example, in the summer of 2000, Philadelphia was the site of days of large political demonstrations in connection with the City's hosting of the Republican National Convention.  In response to those demonstrations, Philadelphia police repeatedly used excessive force and their arrest powers to suppress lawful protest activity, including surreptitiously infiltrating protest groups and preemptively raiding a West Philadelphia puppet-making warehouse.  Nearly 400 people were arrested, with many held in custody on extremely high bails to keep them off the streets until the convention was concluded.  Once the criminal charges were brought to court, however, nearly all were dismissed or ended in acquittals.  Over the next

several years, the City agreed to settlements of resulting civil rights lawsuits with payments totaling hundreds of thousands of dollars.

106.    In the fall of 2011, Occupy Philadelphia—an encampment of political demonstrators at City Hall arising out of the nationwide Occupy Wall Street movement—was the subject of similarly abusive conduct.  On November 30, 2011, in an action directed by then Commissioner Charles H. Ramsey, police evicted the demonstrators from City Hall and trailed them while they peacefully marched through the City, only to then engage in mass groundless arrests.  Following a criminal trial which resulted in the acquittal of all of the arrestees, the City, yet again, paid hundreds of thousands of dollars to those who had been unlawfully detained and charged.

107.    Despite this history, through the early 2010s, the City continued in its acquiescence to, and enabling of, unconstitutional conduct by its officers.  In that time period, as the use of smart phones to video police engaged in misconduct grew rapidly, Philadelphia police officers routinely retaliated against civilians who sought to observe and record public police activity.  While City officials were aware that PPD officers had arrested and physically abused people for the mere act of videorecording, they failed to train, supervise, and discipline the City's officers.  Instead, in response to lawsuits brought by people subjected to such unlawful retaliation, the City argued in federal courts that its officers were protected by the legal doctrine of qualified immunity.  In July 2017, after more than five years of litigation of such lawsuits, the Third Circuit issued a precedential decision in *Fields v. City of Philadelphia* ruling that the First Amendment protects civilians engaged in the act of photographing, filming, or otherwise recording police conducting their official duties in public.

108.    The above examples are a small selection of high-profile incidents in which Philadelphia police have used unlawful force and arrest powers against political demonstrators and people engaged in protected First Amendment activity.  Given this history, by June 1, 2020, the City's policymakers knew and understood that Philadelphia police officers would continue to engage in such misconduct in the event of mass political protest.

### 3.    The City's Adoption of Plans for Violent Police Responses to the George Floyd Protests

109.    Before May 2020, the City had in place operational plans to deal with massive protests.  The plans were focused on activating hundreds of police officers to engage in crowd control with the goal of allowing peaceful protesters to march and demonstrate with minimal interference.

110.    The plans also emphasized the use of officers assigned to the Philadelphia Police Department's Civil Affairs Unit.  Officers in that unit receive specialized training in the rights of persons to engage in political expression and in the crowd-control tasks that arise in large protest settings.  The officers operate in plain clothes and are discouraged from appearing threatening to those engaged in a demonstration.

111.    Within days of the May 25, 2020, murder of George Floyd, the leadership of the PPD was aware that there would be large demonstrations in opposition to police violence throughout the City.

112.    Despite their knowledge and expectation that massive protests would occur all over the City, by May 30, 2020, no one within the PPD or other City leadership had implemented any of their previously existing operational plans to ensure the safety of the public and the demonstrators.

113.     On May 30, protests grew in size throughout Center City Philadelphia, and some people began to vandalize stores in major retail corridors.  As people stole merchandise from stores, City policymakers provided officers no coordinated plan.  Scores of people were injured and properties were damaged.

114.     The next day, May 31, Philadelphia Police Commissioner Danielle Outlaw publicly acknowledged that the PPD had been slow to implement a plan to respond to protests, telling reporters that coordinated implementation of a strategy did not happen as quickly as she would have liked.

115.     In the afternoon and evening of May 31, hours after Commissioner Outlaw acknowledged PPD's lack of planning for demonstrations, a large group of protesters gathered on 52nd Street in West Philadelphia.  Based on reports of looting at commercial establishments, police brought into the area military style armored vehicles.  Officers in those vehicles, outfitted in full body armor with gas masks, face shields, and helmets, exited those vehicles and fired tear gas at alleged "looters."  Officers did not stop there, continuing to fire tear gas canisters on residential streets, causing extreme physical and mental harm to non-violent protesters as well as residents who were, among other things, merely standing on their front porches.

116.     It thus became clear that by the afternoon of May 31, the City's policymakers had developed a plan to use extreme force against demonstrators.

117.     This extreme use of force continued into June 1, as, shortly before Mr. Gorski was assaulted, a unit of PPD officers dressed in tactical military gear fired tear gas cannisters at hundreds of peaceful demonstrators on the Vine Street Expressway.[5]

---

[5] The violent police responses to demonstrations in West Philadelphia and on the Vine Street Expressway are the subject of multiple lawsuits currently pending in this Court.  *See Smith et al. v. City of Philadelphia*, No. 20-cv-3431-JP; *Weltch et al. v. City of Philadelphia*, No. 20-cv-

118.    These decisions by policymakers of the City of Philadelphia communicated to officers throughout the PPD, including defendants Bologna, McPoyle, and Dillard, that they should use extreme force and violent tactics when dealing with demonstrators, or, at a minimum, that they would not be held accountable for use of extreme force and violent tactics.

### 4.    The Use of the House of Correction to Detain Arrested Political Demonstrators

119.    The House of Correction, the facility where Mr. Gorski was detained following his arrest, had been closed in 2018 after more than 140 years in operation.

120.    The facility was built in 1874 and rebuilt in 1927, and, by the mid 1990s, leaders in the Philadelphia Department of Prisons called for its closing.

121.    With walls caving in and exposed and leaking pipes, the facility was known to pose a substantial danger to the health of people incarcerated there as well as the staff.

122.     In 2018, members of Philadelphia's City Council described conditions in the facility as "inhumane" and noted that "there shouldn't be a human being in the House of Correction[]."[6]

123.    Once the facility was closed, there were no materials maintained there for use by detainees, such as soap, toothpaste, and toilet paper.

124.    As of June 1, 2020, policymakers for the City of Philadelphia were aware that detaining people at the House of Correction would pose serious danger to detainees' health and safety.

---

3432-BMS; *Hough et al. v. City of Philadelphia*, No. 20-cv-3508-AB; *Zolitor v. City of Philadelphia*, No. 20-cv-3612-BMS.

[6] Max Marin, *Philly police held protestors overnight at decommissioned, 'inhumane' House of Corrections*, BillyPenn (July 1, 2020), *available at*, https://billypenn.com/2020/07/01/philly-police-held-protesters-decommissioned-jail-dangerous-house-of-corrections/.

125.    Policymakers for the City of Philadelphia knew, further, that any efforts to ensure the safety of detainees in the House of Correction would require substantial planning and preparation.

126.    Despite this knowledge, on or about June 1, 2020, policymakers for the City of Philadelphia made a last-minute decision to reopen the facility for the purpose of detaining people arrested during protests.

127.    They did so without preparation, without obtaining necessary materials for sanitation, and without communicating to Philadelphia Department of Prisons employees instructions as to how to ensure the safety of people detained in the facility.

128.    As a result of the City of Philadelphia's deliberate indifference and unreasonable failure to ensure safe conditions, detainees arrested during protests on or around June 1, 2020, were subjected to dangerous and harmful conditions.

**C.    The Violations of Mr. Gorski's Constitutional Rights and Mr. Gorski's Damages**

129.    There was no legal cause to justify the use of force against Mr. Gorski, and the force used against Mr. Gorski was unreasonable and excessive.

130.    At no time did Mr. Gorski commit any offense in violation of the laws of the City of Philadelphia, the Commonwealth of Pennsylvania, or the United States, and there was no legal cause to justify the stop, detention, and arrest of Mr. Gorski.

131.    At the time that the defendants used force against and unlawfully detained Mr. Gorski, he was engaged in protected political speech, and the defendants used force against him and detained him in retaliation for his political speech.

132.     The conditions to which Mr. Gorski was subjected during his detention were unreasonable and maintained with deliberate indifference to the health and safety of detainees at the House of Correction.

133.     At all times relevant to this Complaint, the conduct of defendants Bologna, McPoyle, and Dillard was in willful, reckless, and callous disregard of Mr. Gorski's rights under federal and state law.

134.     As a direct and proximate result of the conduct of all defendants, Mr. Gorski suffered and continues to suffer physical harm, emotional trauma, loss of liberty, and financial losses.

## V.     CAUSES OF ACTION

**Count 1**
**Plaintiff v. Defendants Bologna, McPoyle, and Dillard**
**Unlawful Use of Force**

135.     The actions of defendants Bologna, McPoyle, and Dillard violated Mr. Gorski's right under the Fourth and Fourteenth Amendments to the United States Constitution to be free from the unreasonable use of force.

**Count 2**
**Plaintiff v. Defendants Bologna, McPoyle, and Dillard**
**Unlawful Arrest and Seizure**

136.     The actions of defendants Bologna, McPoyle, and Dillard violated Mr. Gorski's right under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unlawful arrest and detention.

**Count 3**
**Plaintiff v. Defendants Bologna, McPoyle, and Dillard**
**Retaliation Against Protected Speech**

137.    Defendants Bologna, McPoyle, and Dillard detained Mr. Gorski and used force against him in retaliation for his engaging in protected political speech, and, as such, violated Mr. Gorski's right to freedom of speech under the First and Fourteenth Amendments to the United States Constitution.

**Count 4**
**Plaintiff v. Defendant City of Philadelphia**
**Municipal Liability**

138.    The violations of Mr. Gorski's constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, Mr. Gorski's damages, and the conduct of the individual defendants were directly and proximately caused by the actions and/or inactions of defendant City of Philadelphia, which encouraged, tolerated, ratified and was deliberately indifferent to the following policies, patterns, practices and customs and to the need for more or different training, supervision, investigation or discipline in the areas of:

    a.  The failure to discipline or properly monitor the actions of defendant Bologna given extensive information about his repeated violation of civilians' constitutional rights over a period of more than fifteen years and, further, the ratification of Bologna's misconduct in the wake of his unconstitutional conduct with respect to Mr. Gorski;

    b.  The accepted practice of aggressive and abusive response to peaceful political protest;

c.  Improper planning of a police response to mass protests which encouraged Philadelphia Police Department officers and supervisors to use aggressive and violent tactics; and

d.  The affirmative decision to detain people arrested in political demonstrations at the House of Correction, thereby exposing them to unreasonable conditions of confinement.

**Count 5**
**Plaintiff v. Defendants Bologna, McPoyle, and Dillard**
**State Law Claims**

139.    The actions of defendants Bologna, McPoyle, and Dillard constitute the torts of assault, battery, false arrest, and false imprisonment under the laws of the Commonwealth of Pennsylvania.

VI.     **Requested Relief**

Wherefore, plaintiff Evan Gorski respectfully requests:

A.      Compensatory damages as to all defendants;

B.      Punitive damages as to defendants Bologna, McPoyle, and Dillard;

C.      Reasonable attorneys' fees and costs as to all defendants;

D.      Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.


_____
Jonathan H. Feinberg
I.D. No. 88227
Kairys, Rudovsky, Messing, Feinberg & Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
215-925-4400
jfeinberg@krlawphila.com

*Counsel for Plaintiff*